UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRED WALFISH,

                            Plaintiff,

            v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY;
NORTHWESTERN MUTUAL
INVESTMENT SERVICES, LLC; and
MATTHEW J. HOLLERAN,

                            Defendants.

No. 16-CV-5534 (KMK)

OPINION & ORDER

Appearances:

Lucas Colin Buzzard, Esq.
Daniel Maimon Kirschenbaum, Esq.
Joseph & Kirshenbaum LLP
New York, NY
*Counsel for Plaintiff*

Christopher Alan Parlo, Esq.
Terry D. Johnson, Esq.
Sean Patrick Lynch, Esq.
Morgan Lewis & Bockius, LLP
New York, NY and Princeton, NJ
*Counsel for Defendants*

Primitivo Joseph Cruz, Esq.
White and Williams LLP
Philadelphia, PA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Fred Walfish ("Plaintiff") brings this Action against Northwestern Mutual Life Insurance

Company and Northwestern Mutual Investment Services (together, "NWM"), and Matthew

Holleran ("Holleran"), a managing partner for NWM (collectively, "Defendants"), claiming Defendants violated the New Jersey Law Against Discrimination (the "LAD"), N.J. Stat. Ann. § 10:5-12(*l*), when they terminated his contract with NWM on the basis of his age. (*See generally* Stipulation Ex. A ("Am. Compl.") (Dkt. No. 43).)

Before the Court are the Parties' Cross-Motions for Summary Judgment. (*See* Defs.' Not. of Mot. (Dkt. No. 48); Pl.'s Not. of Cross-Mot. (Dkt. No. 57).) For the following reasons, both Motions are denied.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' respective statements pursuant to Local Civil Rule 56.1 and the responses to those statements. (*See* Defs.' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") (Dkt. No. 50); Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") (Dkt. No. 64); Pl.'s Resp. to Defs.' 56.1 ("Pl.'s 56.1 Resp.") (Dkt. No. 62); Defs.' Resp. to Pl.'s 56.1 ("Defs.' 56.1 Resp.") (Dkt. No. 78).) The facts as described below are not in dispute except to the extent indicated.

#### 1. Plaintiff's History With NWM

NWM is a life insurance company headquartered in Milwaukee, Wisconsin, the core business of which is underwriting, issuing, and servicing insurance policies and annuities. (Defs.' 56.1 ¶¶ 1–2.) Under its business model, NWM enters into independent contractor arrangements with "General Agents" in different geographic areas, who operate local agencies, contract with independent contractor insurance agents, and are authorized to solicit applications for NWM products and services. (*Id.* ¶ 4.) The contracts between General Agents and their

insurance agents provide that the insurance agents work as independent contractors, rather than as employees of the General Agent or of NWM.  (*Id.* ¶ 5.)

### a.  Plaintiff's Contract

Plaintiff first entered into a contract with NWM in 1996 at the age of 45, and entered into "superseding" contracts with NWM in 2009 and 2010 at the ages of 58 and 59.  (*Id.* ¶¶ 6–7.) From approximately 1999 to 2009, Plaintiff's General Agent was John Blumburg ("Blumburg"). (Pl.'s 56.1 ¶ 36.)  In February 2010, Plaintiff entered into a "full-time agent's contract" (the "full-time contract") with the Seery Financial Group LLC ("SFG"), a White Plains, New York-based General Agency owned and operated by General Agent Robert Seery ("Seery").  (Defs.' 56.1 ¶ 8.)

NWM establishes minimum annual production requirements that full-time contract agents must meet to maintain their contracts.  (Pl.'s 56.1 ¶ 12; Defs.' 56.1 Resp. ¶ 12; Defs.' Decl. in Supp. of Mot. for Summ. J. ("Defs.' Decl.") Ex. J ("Handal Decl.") ¶ 5 (Dkt. No. 51).) If an agent fails to meet his or her minimum requirements, NWM in its discretion may terminate the contract; however, NWM sometimes permits an agent to pay a fine in lieu of having his or her contract terminated.  (Defs.' 56.1 Resp. ¶¶ 16–17; Pl.'s Decl. in Supp. of Mot. for Summ. J., Part 1 ("Pl.'s Decl. Pt. 1") Ex. 1 ("Riedl Dep."), at 28–29 (Dkt. No. 59).)[1]  However, beginning the year before an agent turns 65, the option to pay a fine for missed production targets is not

---

[1] Defendants dispute Plaintiff's assertion that an agent may pay a fine "in lieu of" having his or her contract terminated.  Instead, Defendants admit that "agents may be permitted to pay a fine or assessment if they fail to satisfy their minimum production requirements depending upon the circumstances and at the discretion of their Managing Partner, General Agent, District Agent[,] or Field Director, as applicable, and if they do so their contract may or may not be terminated."  (Defs.' 56.1 Resp. ¶ 16.)  Defendants do not specify under what circumstances an agent might be asked to pay a fine and still have his or her contract terminated, and no cited record evidence provides any examples of an agent paying a fine and having his or her contract nonetheless terminated, or otherwise clarifies under what circumstances that might occur.

available.  (Pl.'s 56.1 ¶ 18; Pl.'s Decl. Pt. 1 Ex. 3 ("Pl.'s Seabolt Dep."), at 61; Reidl Dep. 78;

Pl.'s Decl. Pt. 1 Ex. 2 ("Handal Dep."), at 44–45.)[2]

Plaintiff's full-time contract included a termination provision which provided in relevant

part that the agreement "shall terminate upon the first to occur of" the death of the agent, the

termination of the existing contract between the General Agent and NWM, or the end of the

month in which the agent turns 65 years old.  (Defs.' 56.1 Resp. ¶ 6; Defs.' Decl. Ex. P ("Full-

Time Contract") ¶ 19; Seabolt Dep. 17 ("Q: Is it your understanding that a full-time contract with

an agent at Northwestern Mutual ends at the end of the month when the agent turns 65?  A: I

believe so.").)  When an agent's full-time contract ends, the agent may, at NWM's discretion,

receive an amendment allowing the contract to extend beyond the date of expiration.  (Pl.'s 56.1

¶ 9; Defs.' 56.1 Resp. ¶ 9; Reidl Dep. 43–44.)  Alternatively, the agent could enter into a "senior

contract," pursuant to which the agent continues selling NWM products but is no longer required

to meet any minimum production requirements.  (Pl.'s 56.1 ¶¶ 10, 19.)  NWM's Field

Compliance Manual describes the senior contract as "a transitional contract available to veteran

representatives who want to continue to write new business and receive commissions at the same

rates as before retirement but prefer not to have a minimum earnings requirement," and as "a

way for experienced Northwestern Mutual Financial representatives to transition to retirement

while continuing to solicit and receive commissions."  (Pl.'s 56.1 ¶¶ 20–21; Pl.'s Decl. in Supp.

of Mot. for Summ. J., Part 2 ("Pl.'s Decl. Pt. 2") Ex. 19 ("Senior Agent Status") (filed under

---

[2] Defendants deny this assertion.  However, Plaintiff's statement is supported by
deposition testimony of NWM employees.  (*See* Seabolt Dep. 61 ("My understanding is if
[agents] fail minimum the year prior to turning 65 they are not eligible to pay the fine."); Reidl
Dep. 78 ("If [Plaintiff] was coming up on 65, he wouldn't be able to pay a fine and extend his
contract because he had failed minimum earnings."); Handal Dep. 45 (noting that he was
informed Plaintiff "was not eligible to pay a fine because of his age" in the year before he turned
65).)

seal) (Dkt. No. 60).)  Agents on senior contract are "considered to be 'retired' for benefits purposes" with respect to certain employee benefits; for example, they are not eligible for disability coverage, and Medicare, rather than NWM's medical plan, becomes their primary health insurance provider.  (Pl.'s 56.1 ¶¶ 25–28; Defs.' 56.1 Resp. ¶ 28.)  If an agent who reaches age 65 has no active contract, has not received a contract extension, or has not entered into a senior contract, the agent's employee benefits will "default" to those of an agent on senior contract "until such time as the benefits group receives confirmation that the agent has retired or the agent's existing Full-Time Agent's Contract is being extended."  (Defs.' 56.1 Resp. ¶ 23.)

### b.  Plaintiff's Performance

Shortly after signing the full-time contract, Plaintiff objected when Seery modified an existing expense allowance program within his agency; Plaintiff asserts that pursuant to an oral contract with Blumburg, the prior General Agent, Plaintiff was entitled to a permanent expense allowance of 18%, but under the modified program Seery limited the expense allowance to 4%. (Defs.' 56.1 ¶¶ 10–11.)  Plaintiff filed a lawsuit in small claims court against Seery, NWM, and the CEO of NWM.  (Defs.' 56.1 ¶ 12; Defs.' Decl. Ex. O ("Small Claims Complaint").) Defendants assert, and Plaintiff denies, that after the lawsuit, Plaintiff "vowed to other agents working in his office that he would not do anything ever again to help or benefit Mr. Seery or his agency, including selling NWM products."  (Defs.' 56.1 ¶ 13; Pl.'s 56.1 Resp. ¶ 13; Defs.' Decl. Ex. D ("Cenicola Dep."), at 24–26; Seabolt Dep. 59–60.)

In December 2014, Seery's General Agent contract with NWM was terminated.  (Defs.' 56.1 ¶ 15.)  In January 2015, Defendant Holleran assumed the duties of the Managing Partner of

Plaintiff's office, "inheriting [Plaintiff] as part of the agency he took over."  (*Id.* ¶ 16.) [3]  Plaintiff

did not enter into a new contract after Seery's relationship with NWM ended, but he continued to

solicit applications for and sell NWM products and receive commission from his sales.  (*Id.*

¶ 17.)  Holleran worked out of an office in Morristown, New Jersey, while Plaintiff worked out

of his home in New York and out of his Montvale, New Jersey office; as a result, Holleran and

Plaintiff only encountered each other two or three times between January 2015 and June 2016,

and spoke on the phone approximately three times.  (*Id.* ¶ 18.)

In January 2015, Holleran "met with veteran agents in the office" to learn more about the

agency.  (*Id.* ¶ 57.)  Two agents, Anna Cenicola ("Cenicola") and Joel Koral ("Koral"), affirmed

that they told Holleran that Plaintiff did not fit the culture of the agency, and that he was a

"cancer."  (*See id.* ¶ 60; Cenicola Dep. 21–22; Defs.' Decl. Ex. I ("Koral Decl.") ¶¶ 18–19.) [4]

---

[3] The Parties dispute whether the termination of Seery's General Agent contract in 2014 ended Plaintiff's formal contract in light of the termination provision of the full-time contract, which provides that the contract ends upon "the termination of the existing contract between the General Agent and NWM."  (Full-Time Contract ¶ 19; Defs.' 56.1 Resp. ¶ 89.)  Plaintiff asserts that NWM "endorse[d]" his full-time contract with Seery and that he continued to perform pursuant to his understanding that his contract had not been terminated.  (Pl.'s 56.1 ¶ 89.)  All Parties rely on the terms of the full-time contract, particularly the minimum production requirements, in their Motions, and deposition testimony suggests that both Plaintiff and NWM had assumed Plaintiff's contract was still in force.  (*See* Handal Dep. 42–45 (explaining that NWM considered "what the impact would be to [Plaintiff's] contract" because of "[h]is failing of contract minimums" for 2015); Reidl Dep. 78 ("If [Plaintiff] was coming up on 65, he wouldn't be able to pay a fine and extend his contract because he had failed minimum earnings."); *see also* Defs.' 56.1 ¶ 45 (asserting that Plaintiff and Holleran had a discussion on January 20, 2016 "about [Plaintiff's] contract status because [he] had missed his minimum production requirements for 2015").)

[4] Plaintiff attributes Cenicola's and Koral's statements to separate personal disputes he had with each of them, while Defendants maintain the agents' opinions of Plaintiff are based on difficulties Plaintiff caused when Cenicola and Koral were tasked with finding new office space for the agency in 2013.  (*See* Defs.' 56.1 ¶¶ 60–63; Pl.'s 56.1 Resp. ¶¶ 62–63; Cenicola Dep. 13–18; Koral Decl. ¶¶ 11–15; Decl. of Fred Walfish ("Walfish Decl.") ¶¶ 29–32 (Dkt. No. 63).)  Some other agents who Plaintiff worked with described Plaintiff as having an "honest[] and unique perspective," saying he was "open and approachable" and "always had a pleasant

These comments were relayed to Jason Handal ("Handal"), NWM's Vice President of Distribution Performance.  (Defs.' 56.1 ¶ 69; Pl.'s 56.1 ¶ 91.)

Additionally, Plaintiff had ongoing issues with regulatory compliance.  (Defs.' 56.1 ¶ 73.)  Plaintiff's February 2012 annual review reflects several compliance deficiencies, and notes that "[c]ertain activities could have consequences with the SEC, FINRA, State insurance Commissions, Northwestern Mutual[,] and other bodies of authority in this industry."  (*See* Defs.' Decl. Ex. Y ("Compliance Reviews"), at 2–3 (noting that Plaintiff's client files did not contain "[d]etailed case notes," and that his "letterhead, fax coversheet[,] and business cards are outdated").)[5]  Plaintiff's 2013 review, dated May 22, 2013, notes, "[a]s mentioned in your 2011 and 2012 compliance review follow up letter, your letterhead and business card stationary is still outdated."  (*Id.* at 13.)  In March 2016, Eileen Seabolt ("Seabolt"), the Director of Network Office Supervision who "was charged with ensuring regulatory compliance in Mr. Holleran's agency," (Defs.' 56.1 ¶¶ 70, 72), performed an annual review of Plaintiff's "business practices and the Books and Records [he] maintain[s] to assess compliance with the firm's policies and procedures, as well as[] FINRA and MSRC Rules," (*see* Defs.' Decl. Ex. Z ("Mar. 24, 2016 Compliance Review"), at 2).[6]  The review again found that Plaintiff was noncompliant with policies regarding letterhead and business card language, and that he failed to create and

---

demeanor."  (Pl.'s 56.1 Resp. ¶ 65; Pl.'s Decl. Ex. 10 ("Greenblatt Decl.") ¶ 4; Pl.'s Decl. Ex. 11 ("Schultz Decl.") ¶¶ 5–6.)  These agents also dispute Defendants' assertion that Plaintiff created problems when NWM was looking to move to a new office space, saying Plaintiff was actually "of great assistance to the office as a whole."  (*See* Greenblatt Decl. ¶ 6; Schultz Decl. ¶ 7.)

[5] Because the collection of Compliance Reviews are not consecutively-paginated, the Court cites to the ECF-generated page numbers at the upper right corner of each page.

[6] Because the March 24, 2016 Compliance Review does not include page numbers, the Court cites to the ECF-generated page numbers at the upper right corner of each page.

maintain client case files, emphasizing that these were "repeat deficienc[ies]." (*Id.* (emphasis omitted).)[7]

### 2. Plaintiff's Minimum Production Requirements

Under the terms of Plaintiff's full-time contract, he was required "to achieve a minimum level of production each year," and "his contract [could] be terminated for a failure to meet the threshold." (Handal Decl. ¶ 5; *see also* Pl.'s 56.1 Resp. ¶ 25.) Although Plaintiff, like all NWM agents, was permitted to sell the insurance products offered by other companies, his full-time contract provides that he "shall not do business for any other company" with respect to forms of insurance policies or annuities that NWM offers, except for persons who are already insured by NWM "or who have been found by [NWM] to be insurable only at higher than standard premium rates which are unacceptable to the applicants. (Full-Time Contract ¶ 6; *see also* Pl.'s 56.1 ¶ 78; Defs.' 56.1 Resp. ¶ 78.) In 2012 and 2013, Plaintiff met his production requirements. (Defs.' 56.1 ¶ 28; Defs.' Decl. Ex. C ("Walfish Dep."), at 623–26.) In 2014, Plaintiff also met his production requirements. (Defs.' 56.1 ¶ 30.)[8] Only 21% of the revenue generated by

---

[7] Plaintiff concedes that his reviews note compliance deficiencies, but maintains that "best practices are not mandatory requirements that Plaintiff was required to follow," and that once he was "informed that best practices had become requirements, he changed his practice to comply with those requirements." (Pl.'s 56.1 Resp. ¶¶ 81–82.)

[8] Defendants assert that he met the 2014 minimum production requirement "only by selling himself and his son insurance policies in December 2014, just before the books closed"; Plaintiff concedes that this is how he met the 2014 single-year production requirement, but that Defendants' proffered evidentiary support "contains nothing about whether Plaintiff had met" the alternative two-year minimum production requirement, which provides that an agent can meet his or her production requirement based on combined commissions over two years. (Defs.' 56.1 ¶ 30 (emphasis omitted); Pl.'s 56.1 Resp. ¶ 30; *see also* Defs.' Decl. Ex. R ("NWM Minimum Earnings Chart").) In any event, there is no dispute that Plaintiff met his production requirements for 2014 under the full-time contract.

Plaintiff's sales in 2014 came from selling NWM products, while the remaining 79% of his sales came from 17 other insurance companies for which he sold products.  (*Id.* ¶ 39.)

In 2015, Plaintiff's production minimum required him to generate at least $39,600 in commissions from new sales of NWM life insurance products, or a minimum of $130,600 in total commissions from the sale of all NWM products for the years 2014 and 2015 combined. (*Id.* ¶ 26; Defs.' Decl. Ex. R ("NWM Minimum Earnings Chart").)  Plaintiff failed to meet his minimum production requirement in 2015, or for the combined years 2014 and 2015; this was the first time Plaintiff missed his minimum production requirement in his 20-year career with NWM.  (Defs.' 56.1 ¶¶ 32–34, Pl.'s 56.1 ¶ 95.)  However, Plaintiff generated $226,217 in total sales of other companies' insurance products in 2015, and sales of NWM products made up only 18.6% of his total sales for the year; Plaintiff asserts that his compensation from NWM, which totaled $58,204.63 in 2015, was nonetheless "more compensation than he earned from any other company whose insurance he sold that year."  (Defs.' 56.1 ¶ 38; Pl.'s 56.1 ¶ 38 (emphasis omitted); Defs.' Decl. Ex. T ("Dec. 2015 NWM Commission Statement").)  Plaintiff also asserts, and Defendants dispute, that his 2015 sales were lower than prior years because he was "incapacitated for three months in the summer of 2015 for medical reasons."  (Pl.'s 56.1 ¶ 96; Defs.' 56.1 Resp. ¶ 96.)  Throughout 2015, Plaintiff received several notices informing him that he was in danger of failing to meet the minimum production requirements, and warning him that if he does not meet his production requirement by the end of the year, his contract can be terminated.  (Defs.' 56.1 ¶ 42; Defs.' Decl. Ex. U ("Warning Notices").)

On January 20, 2016, Plaintiff had a telephone call with Holleran, which Plaintiff recorded, in which they discussed Plaintiff's failure to meet his minimum production requirements, and whether it would impact his contractual relationship with NWM.  (Defs.' 56.1

¶¶ 43–44; *see generally* Defs.' Decl. Ex. V ("Jan. 20 Call Tr.").)[9]  The Parties dispute the focus of the conversation.  Defendants state that the discussion was focused on Plaintiff's "contract status . . . because [Plaintiff] had missed his earnings requirements."  (Defs.' 56.1 ¶ 45.)  Plaintiff asserts that he arranged the call to request "an exception to stay on [the] regular [full-time] contract after age 65."  (Pl.'s 56.1 Resp. ¶ 45; Jan. 20 Call Tr. 18; Defs.' Decl. Ex. G ("Holleran Dep."), at 10 ("Q: Is it your understanding that Mr. Walfish was having this conversation with you, at least in part, because he was concerned as to his contract status with Northwestern after his regular contract ends at age 65?  A. Yes.").)  The call transcript also reflects a disagreement between Holleran and Plaintiff with respect to the purpose of the call.  (*See* Jan. 20 Call Tr. 12–13 ("Fred Walfish: We're having this conversation because I turn 65 in March.  Matt Holleran: Correct.  Fred Walfish: That's—that's all, I turn 65— . . .  Matt Holleran: No, we're having . . . we're having this conversation because you failed minimums last year, Fred.").)

The transcript reflects that on the call, Plaintiff acknowledged that he missed his production minimums for 2015, but that he sought to continue on his full-time contract, rather than "go on senior contract" as one "normally" would at age 65.  (*See* Jan. 20 Call Tr. 2–3 ("Fred Walfish: . . . I turn 65 in March . . . [a]nd normally I would go on senior contract.  Matt Holleran: Yep.  Fred Walfish: I would appreciate being able to hold off for one year on that.").)  Holleran denied Plaintiff's request to remain on full-time contract, and Plaintiff asked if that meant he would be going on senior contract when he turns 65; Holleran responded, "I'm not saying that

---

[9] Defendants submitted a transcription of the January 20, 2016 phone call between Holleran and Plaintiff.  Plaintiff has not challenged the accuracy of the transcription, and the Parties rely on it in their submissions.  The Court will therefore consider the call transcription in deciding the Parties' Motions.  *See Capobianco v. City of New York*, 422 F.3d 47, 55 (S.D.N.Y. 2005) ("[I]nadmissible [evidence] may be considered by the court if not challenged.  The objection must be timely or it will be deemed to have been waived." (citation and quotation marks omitted)).

that would be an option." (*Id.* at 5.)  Plaintiff said that he was of the understanding that senior

contract is an option "offered to every single agent, that when you hit 65, you go on senior

contract and there are no more production requirements"; Holleran responded that senior contract

"does not have to be granted," and is at the discretion of the managing partner.  (*Id.* at 5–6.)

Throughout the call, Holleran repeatedly asked Plaintiff to submit an email or letter explaining

"what it is that you want to do or what you're going to do differently" with respect to his

production numbers and his impact on office culture.  (*Id.* at 7–8, 10, 14, 19, 25, 31, 33, 47–48.)

Plaintiff responded that he was committed to his performance at NWM, but emphasized that

because of his age, he wanted to go on senior contract so that he could continue servicing his

clients without having to pursue new sales to meet production requirements.  (*See id.* at 7 ("[M]y

plan is to wind down, take it easy, kick back, I'm 65, continue to service my clients . . . .  That's

the whole reason you have a senior contract without—without production requirements."); *see

also id.* at 21–22, 26–27, 42–44.)  Holleran ended the call by suggesting that Plaintiff submit a

written plan "outlining how [Plaintiff] intended to increase his sales and/or otherwise be a

productive member of the agency."  (Defs.' 56.1 ¶ 52; Jan. 20 Call Tr. 47 ("Fred, I would really

encourage you . . . if you really want to maintain contract status with Northwestern Mutual, I

would take some time, I would sit down, and I would write out, you know, what you are going to

do in your practice, what you can commit to . . . .").)

     Two days after the call, Plaintiff submitted a letter to Holleran as requested.  (*See* Defs.'

Decl. Ex. X ("Jan. 22 Letter").)  Plaintiff emphasized that he is "focused [and] . . . committed to

servicing his clients," but that he was "not looking to . . . focus on increased production," which

is his motivation "for securing the [s]enior [c]ontract." (Jan. 22 Letter 36.)[10] Plaintiff's letter also explained that his understanding of NWM policy was that "if an agent over the age of 60 missed his minimums he was offered early access to the [s]enior [c]ontract and secondly, upon reaching 65 he automatically transitioned unless a specific exception was made to continue with the full time contract." (*Id.*) Plaintiff emphasized that it was "simply incomprehensible" that he would be denied a senior contract that "had been promised" when he joined NWM "simply because 'in your 64th year you missed your minimums.'" (*Id.* at 37.)

### 3.  Termination of Plaintiff's Contract

On January 20, 2016, Holleran "conveyed to Ms. Seabolt his preliminary recommendation that [Plaintiff's] affiliation with NWM be terminated." (Defs.' 56.1 ¶ 89; Defs.' Decl. Ex. BB ("Jan. 22, 2016 Email").)[11] On January 21, 2016, Handal expressed in an email that he hopes Plaintiff "will see senior status (or the fine) as viable options, provided we are ok with that." (Defs.' Decl. Ex. AA ("Jan. 21, 2016 Email").) However, Handal testified that at some point, "someone inform[ed] [him] that [Plaintiff] was not eligible to pay a fine because of his age," and confirmed that because of Plaintiff's age "that option was essentially off the table." (Handal Dep. 45.) On January 22, 2016, after Plaintiff submitted his letter to Holleran, Holleran emailed Seabolt that they should "move forward now" with terminating Plaintiff's contract. (Defs.' 56.1 ¶ 91; Jan. 22, 2016 Email.) In a January 25, 2016 email, Handal noted that Seabolt was "concerned" about offering Plaintiff a senior contract. (*See* Defs.'

---

[10] Because the January 22 Letter does not include page numbers, the Court cites to the ECF-generated page numbers at the upper right corner of each page.

[11] Defendants assert, and Plaintiff concedes, that Holleran first conveyed his preliminary recommendation that Plaintiff's contract be terminated on January 20, 2016, (*see* Pl.'s 56.1 Resp. ¶ 89), although the email Defendants cite in support of this statement appears to have been sent on January 22, 2016.

Decl. Ex. CC ("Jan. 25, 2016 Email").)  Holleran testified that during the decision-making process, Handal encouraged him to "slow down" and "not rush th[e] decision" to terminate Plaintiff's contract.  (Holleran Dep. 29.)

In the ensuing months, Holleran, Seabolt, and Handal had a number of discussions regarding NWM's contractual relationship with Plaintiff; the Parties dispute whether these discussions focused on whether to renew Plaintiff's contract after it ended automatically when he turned 65, (*see* Pl.'s 56.1 ¶ 107; Handal Dep. 44 ("Q. Were you aware that [Plaintiff] was approaching his 65th birthday . . . [a]nd in that case his full-time contract would just end, were you aware of that?  A. Yes."), or whether to terminate NWM's working relationship with Plaintiff due to his failure to meet minimum production requirements, (Defs.' 56.1 Resp. ¶ 107, Handal Dep. 70–71 ("I don't believe the turning 65 was the issue that was governing the decision to terminate the contract. . . .  [W]e were not focused on the mechanics of the contract in these conversations.")).

On May 10, 2016, Holleran met with Plaintiff and gave him written notice that "his affiliation with NWM would be terminated 30 days later, on June 10, 2016."  (Defs.' 56.1 ¶ 95; Defs.' Decl. Ex. DD ("Termination Notice").)  The termination notice states, "[p]ursuant to the provisions of the contract between us, the contract is hereby terminated 30 days from today's date."  (Termination Notice.)  Defendants note, and Plaintiff concedes, that Plaintiff believed that he remained on a full-time contract beyond his 65th birthday.  (Pl.'s 56.1 Resp. ¶ 96; Walfish Dep. 639, 644, 647–51.)  However, Handal testified that when Plaintiff received his termination notice, the contract had in fact ended "simply as a matter of fact because of [Plaintiff] having turned 65 shortly before," and that the termination notice was provided simply to "document the understanding of the parties" even though Plaintiff's contract was already "over" when he

received it.  (Handal Dep. 64–65, 71; *see also id.* at 70 (noting that Plaintiff's contract "ended on

its own when he turned 65").)  Plaintiff's "status for benefits purposes" defaulted to "senior

agent" on April 1, 2016 pursuant to the expiration of his contract.  (Defs.' 56.1 Resp. ¶ 124.)

    In addition to Plaintiff, eight other agents who failed to satisfy their 2015 production

minimums were terminated in 2016, each of whom were younger than Plaintiff, ranging in age

from 25 to 64.  (Defs.' 56.1 ¶¶ 97–98.)  Some agents who missed their minimum production

requirement for 2015 were allowed to pay the fine and remain on contract.  (Pl.'s 56.1 Resp.

¶ 97; Pl.'s Decl. Pt. 2 Ex. 20 ("Agent Status Chart").)

    B.  Procedural Background

    Plaintiff filed his original Complaint on July 12, 2016, (Compl. (Dkt. No. 1)), and

Defendants filed their answers on September 16, 2016, (Dkt. Nos. 20, 21).  After engaging in

mediation, (*see* Dkt. (entries for Apr. 28, 2017, and June 20, 2017)), the Parties filed a joint

Stipulation on March 5, 2018 agreeing to dismiss all claims with prejudice except for Plaintiff's

claim of age discrimination under § 10:5-12(*l*) of the LAD, and attaching an Amended

Complaint, (*see* Stipulation 1; Am. Compl.).  The Stipulation also provided that the Parties

agreed to cross-move for summary judgment on the remaining claim in the Amended Complaint,

without further discovery and without requiring Defendants to file answers.  (Stipulation 1.)

Finally, the Stipulation provided that the Parties agree Plaintiff was not an "employee" of

Defendants for purposes of this litigation.  (*Id.* at 2.)

    On March 14, 2018, Defendants filed their Motion for Summary Judgment and

accompanying papers.  (*See* Defs.' Mot.; Defs.' 56.1; Defs.' Decl.; Defs.' Mem. of Law in Supp.

of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 49).)  Plaintiff filed his Cross-Motion for

Summary Judgment and response to Defendants' Motion on April 12, 2018.  (Pl.'s Mot.; Pl.'s

56.1; Pl.'s 56.1 Resp.; Pl.'s Decl. Pts. 1 & 2; Walfish Decl.; Pl.'s Mem. in Supp. of Mot. for

Summ. J. ("Pl.'s Mem.") (Dkt. No. 61).)  Defendants filed a reply and accompanying papers on

April 27, 2018.  (Defs.' 56.1 Resp.; Defs.' Reply in Further Supp. of Mot. for Summ. J. ("Defs.'

Reply") (Dkt. No. 73); Reply Aff. of Sean P. Lynch, Esq. ("Defs.' Reply Aff.") (Dkt. No. 74);

Defs.' Reply Decl. in Further Supp. of Mot. for Summ. J. ("Defs.' Reply Decl.") (Dkt. No. 79).)

Plaintiff filed a reply on May 4, 2018.  (Dkt. No 77.)  Plaintiff's reply did not conform with the

Court's directives, and Plaintiff was ordered to file a five page, double-spaced reply and

withdraw the noncompliant submission.  (Dkt. No. 82.)  Plaintiff complied on May 11, 2018.

(Pl.'s Reply in Further Supp. of Mot. for Summ. J. ("Pl.'s Reply") (Dkt. No. 83).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River

v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800

Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

 "However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases."  (citations and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Plaintiff's LAD Claim

The Parties have dismissed all claims in this Action by stipulation except for Plaintiff's claim of age discrimination in violation of the LAD, N.J. Stat. Ann. § 10:5-12(*l*).  (*See* Stipulation; Am. Compl. ¶¶ 18–21.)  Both Parties move for summary judgment on the remaining claim.  Defendants argue that Plaintiff has "presented no direct evidence" that his contract was terminated because of his age, and that he cannot meet his burden under the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), to establish a prima facie case of unlawful age discrimination, or demonstrate that Defendants' proffered reason for terminating Plaintiff's contract was pretextual.  (Defs.' Mem. 12–13.) Plaintiff argues that the contract itself, which by its terms expired at the end of the month in which Plaintiff reached 65 years of age, "is direct evidence that [Defendants] ha[ve] relied on an 'explicit classification based on age,'" and that the *McDonnell Douglas* framework is therefore

17

inapplicable.  (Pl.'s Mem. 18 (quoting *Epter v. N.Y.C. Transit Auth.*, 127 F. Supp. 2d 384, 387 (E.D.N.Y. 2001)).)[12]  Plaintiff also asserts that even if the Court finds the *McDonnell Douglas* analysis applies, Defendants "cannot overcome the factual issues present on the record that support a jury finding of pretext."  (*Id.* at 26.)

      1.  Applicable Law

Section 10:5-12(*l*) of the LAD provides that "[i]t shall be an unlawful employment practice . . . [f]or any person to refuse to . . . contract with . . . or otherwise do business with any other person on the basis of . . . age."  N.J. Stat. Ann. § 10:5-12(*l*).  Section 10:5-12(*l*) has been construed as "prohibit[ing] refusals to do business with independent contractors based on age," *J.T.'s Tire Serv., Inc. v. United Rentals N. Am., Inc.*, 985 A.2d 211, 240 (N.J. App. Div. 2010) (collecting cases), as well as "discriminatory terminations of contracts," *id.* (citation omitted).  "In a case alleging age discrimination under the LAD, [a plaintiff] must show that the prohibited consideration, age, played a role in the decision making process and that it had a determinative influence on the outcome of that process."  *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 207 (1999) (citation, alteration, and quotation marks omitted).  "[T]he LAD draws significantly from federal anti-discrimination law.  Thus, [a plaintiff's] LAD claim is appropriately analyzed by examination of federal cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ('ADEA'), 29 U.S.C. § 621, *et seq.*, provisions of which were modeled after Title VII."  *Wright v. L-3 Commc'ns Corp.*, 227 F. Supp. 2d 293, 297 (D.N.J. 2002) (citations omitted).

---

[12] Because Plaintiff failed to include page numbers in his Memorandum, the Court cites to the ECF-generated page number in the upper right corner of each page.

A plaintiff may establish a violation of § 10:5-12(*l*) "by either direct or circumstantial evidence."  *See Sisler*, 157 N.J. at 208; *see also Buchholz v. Victor Printing, Inc.*, 877 F. Supp. 2d 180, 185–87 (D.N.J. 2012) (describing analyses for direct and circumstantial evidence of discrimination).  "[I]n order to establish [a] direct evidence age discrimination claim under the LAD, [a plaintiff] has a 'rigorous burden' to demonstrate 'that age, per se*,* was a substantial factor in an adverse employment decision.'"  *Geltzer v. Virtua W. Jersey Health Sys.*, 804 F. Supp. 2d 241, 250 (D.N.J. 2011) (quoting *Sisler*, 157 N.J. at 207); *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992) ("Should the plaintiff wish to prove his case as a 'mixed-motives' case, he must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 248 (1989) (plurality)); *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1260 (D.N.J. 1994) (explaining that direct evidence is required to establish a "mixed motives case," in which a plaintiff "must demonstrate that discrimination was a motivating factor in an employment decision" (citing *Price Waterhouse*, 490 U.S. at 277) (O'Connor, J., concurring)), *aff'd*, 67 F.3d 291 (3d Cir. 1995).  "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision."  *Buchholz*, 877 F. Supp. 2d at 185 (citation omitted); *see also Sisler*, 157 N.J. at 208 (same).  "Direct evidence is 'evidence, which if believed, proves the existence of the fact in issue without inference or presumption.'"  *E.E.O.C. v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1447 (D.N.J. 1993) (alterations omitted) (quoting Black's Law Dictionary 460 (6th ed. 1990)).  "Where an employee is able to satisfy this rigorous burden and establish a direct prima facie case that age, per se, was a substantial factor in an adverse employment

decision, the burden then shifts to the employer to show it would have made the same decision even in the absence of the impermissible consideration." *Sisler*, 157 N.J. at 209 (citing *Price Waterhouse*, 490 U.S. at 248); *see also Skidmore v. Virtua Health Inc.*, No. 11-CV-503, 2012 WL 2369357, at *5 (D.N.J. June 21, 2012) ("Where an employee has direct evidence of discrimination, but the employer has also presented evidence that it would have terminated the employee even in the absence of any discrimination, the 'mixed-motive' theory applies.  Under that theory, when an employee produces evidence that an employer placed substantial reliance on a proscribed discriminatory factor in making the adverse employment decision, the burden of persuasion shifts to the employer to prove that even if it had not considered the proscribed factor, the employment action would have occurred." (citing *Dorfman v. Pine Hill Bd. of Educ.*, 346 F. App'x 825, 829 (3d Cir. 2009))).[13]

"If a plaintiff is unable to make out a claim for age discrimination using direct evidence, he may instead rely on circumstantial evidence under the *McDonnell Douglas* burden-shifting analysis." *Buchholz*, 877 F. Supp. 2d at 187 (citation omitted); *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (applying *McDonnell Douglas* to age discrimination claims); *Wright*, 227 F. Supp. 2d at 297 ("The Supreme Court of New Jersey has adopted the three-stage inquiry set forth by the United States Supreme Court in *McDonnell Douglas* . . . 'as a starting point' in analyzing claims under the LAD." (quoting *Sisler*, 157 N.J. at 200)).

> Under *McDonnell Douglas,* the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was

---

[13] Although otherwise analytically similar to federal age discrimination claims under the ADEA, "the 'but-for' ADEA causation standard has not yet been adopted for direct evidence NJLAD claims."  *Buchholz*, 877 F. Supp. 2d at 185 n.5 (citations omitted); *see also Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 598 n.3 (D.N.J. 2015) (collecting cases).

> ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.  Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action.  If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination.  At all times, however, the burden of persuasion rests with the plaintiff.

*Smith*, 589 F.3d at 689–90 (citations omitted).  To prove a prima facie case under the LAD, Plaintiff must demonstrate by a preponderance of the evidence that he: "(1) was a member of the protected class, i.e., was over 40, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination."  *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (citation omitted).  "In cases where the position held by the discharged employee was eliminated, or the discharged employee was not replaced, he or she must prove that a younger employee was either retained or treated more favorably."  *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 365 (D.N.J. 1999), *aff'd*, 254 F.3d 1078 (3d Cir. 2001).  If Defendants then "identify a legitimate non-discriminatory reason for the adverse employment action," *Smith*, 589 F.3d at 690, Plaintiff must "prove by a preponderance of the evidence that [the] proffered reason was a pretext for discrimination," *Rich v. Verizon N.J. Inc.*, No. 16-CV-1895, 2017 WL 6314110, at *18 (D.N.J. Dec. 11, 2017).  "At the summary judgment stage, an employee may meet his or her burden of demonstrating pretext 'by providing evidence that would allow a fact finder reasonably to (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'"  *Id.* (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003)).  "In discrimination cases where state of mind is at issue, [courts should] grant . . . summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations

may reveal circumstantial evidence to support the required inference of discrimination.'"
*Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

### 2. Analysis

Plaintiff argues that the expiration term in the contract, which provided that the contract would expire at the end of the month in which Plaintiff turned 65, constitutes direct evidence of age discrimination. (Pl.'s Mem. 18–19.) Defendants argue, relying on *Harrington v. Aetna-Bearing Company*, 921 F.2d 717 (7th Cir. 1991), that an expiration term in a contract based on age is not per se discrimination, and that Plaintiff therefore must establish a prima facie case of age discrimination under the *McDonnell Douglas* framework. (Defs.' Mem. 19–21.)

### a. Direct Evidence

"A plaintiff attempting to prove such discrimination by direct evidence will survive a motion for summary judgment by producing evidence 'which if believed, proves [the] existence of a fact in issue without inference or presumption.'" *Harth v. Daler–Rowney USA Ltd.*, No. 09-CV-5332, 2012 WL 893095, at *2 (D.N.J. Mar. 15, 2012) (quoting *Sisler*, 157 N.J. at 208). Direct evidence warranting a "mixed-motives" analysis includes "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997); *see also Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005) (noting that direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus"). "This kind of evidence, coupled with a firing . . . of a person in the protected age group, would support a finding that the firing was based on an impermissible criterion such as age." *Park v. Seoul Broad. Sys. Co.*, No. 05-CV-8956, 2008 WL 619034, at *9 n.15 (S.D.N.Y. Mar. 6, 2008) (citing *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir.

22

1981)); *see also Lightfoot*, 110 F.3d at 913 (finding the plaintiff "produced sufficient [direct] evidence to earn a mixed-motive [jury] instruction" where the supervisor defendant had "expressed surprise and disbelief when [the plaintiff] said he wanted to work until he was seventy years old" and the plaintiff was terminated at age 56). "[I]f [a plaintiff] shows by direct evidence that there is a genuine issue of fact as to whether age was a determinative factor in [his] discharge, summary judgment is inappropriate." *Maidenbaum*, 870 F. Supp. at 1262 (citations omitted).

Few courts have addressed an express age-based expiration clause in a contract. In *Harrington*, the Seventh Circuit ruled that an expiration clause predicated on a plaintiff turning any age protected by the ADEA was not per se age discrimination, reasoning that there was no "practical difference between fixing a term of years and fixing the date at which the contract expires, and we see no magic in the fact that the date here was a birthday." 921 F.2d at 720. In *Harrington*, the court noted that in terminating the plaintiff's employment, the defendant had not "made a judgment that [the plaintiff] was too old," but rather ended his employment "because the contract had a definite term and the term had ended." *Id.* Similarly, in *Gadsby v. Norwalk Furniture Corporation*, No. 93-CV-420, 1994 WL 411724 (N.D. Ill. 1994), the court granted a defendant's motion for summary judgment in an age discrimination case where the plaintiff relied on an age-based expiration clause but failed to rebut the defendant's evidence that it had "never enforced the mandatory termination provision in such a contract," concluding that "[t]he mere presence of such a term in a contract, without an actual adverse employment action taken on the basis of age, is not age discrimination." *Id.* at *4.[14] However, in *Dahman v. Embassy of*

---

[14] Notably, in both cases the expiration clause was triggered when the plaintiff reached the age of 70, an age that was not protected by the ADEA at the time the contracts were executed. *See id.* (noting that "the mandatory retirement at 70 provision in [the plaintiff]'s

*Qatar*, No. 17-CV-2628, 2018 WL 3597660 (D.D.C. July 26, 2018), *vacated on other grounds*, 2019 WL 330185 (D.D.C. Jan. 25, 2019), the court found a plaintiff had a meritorious claim under the ADEA where the plaintiff's contract automatically expired when the plaintiff reached the age of 64; however, the plaintiff there also received a termination letter that stated he was being terminated "solely" because he was "reaching his retirement age." *Id.* at *8 (alteration omitted). From this limited caselaw, Plaintiff can prevail if he can prove that the refusal to extend his contract or place him on a senior contract was made on the basis of Plaintiff reaching the age of 65, rather than for other, permissible reasons.

The Parties dispute whether Plaintiff was in fact terminated pursuant to the expiration clause. Defendants argue that the decision not to continue Plaintiff's contract or offer him a senior contract was made in January 2016, two months before he turned 65, and was made on the basis of his failure to meet his production requirement the previous year, as well as his reputation in the office and longstanding noncompliance with regulatory rules. (*See* Defs. Mem. 20–21.) In support of their argument, Defendants note that NWM had a longstanding policy to automatically offer a 65-year-old agent a senior contract upon expiration of his or her full-time contract, and that NWM also frequently agrees to extend full-time contracts beyond an agent's 65th birthday, thereby demonstrating that Plaintiff's age was not the reason NWM chose not to do so here. (*Id.* at 22–23.) However, Plaintiff points to Handal's testimony, in which he confirms that Plaintiff's contract ended automatically on April 1, 2016 as a result of the expiration clause, although he denies that the decision not to extend or renew it was based on Plaintiff's age. (*See* Pl.'s 56.1 ¶¶ 123–24; Handal Dep. 70–71.) Furthermore, several NWM

---

contract was not illegal when the contract was made, as the ADEA did not cover individuals over 70 until 1986").

employees testified that Plaintiff was not eligible for the option of paying the fine in lieu of contract termination when he missed his 2015 minimum production requirements because of his age, (*see* Seabolt Dep. 61; Reidl Dep. 78; Handal Dep. 45), which, viewing all evidence in the light most favorable to Plaintiff with respect to Defendants' Motion, arguably contributed to the decision to terminate Plaintiff's contractual relationship with NWM.  Courts have found that where a contract provision or policy denies a benefit, or adds a job requirement, on the basis of age, the provision is discriminatory on its face.  *See Epter*, 127 F. Supp. 2d at 387–88 (holding that a blanket policy requiring employees over the age of 40 to submit to an electrocardiogram test violated the ADEA, making the *McDonnell-Douglas* framework "wholly inapplicable"); *Smilan v. United Airlines, Inc.*, 796 F. Supp. 723, 727 (E.D.N.Y. 1992) (finding pilots' collective bargaining agreement facially discriminatory where contract entitled all pilots to a paid move when assigned to a new location unless the pilot was within two years of "normal retirement," defined as age 60).  Additionally, the Court notes that, although the claim at issue here is not a forced retirement claim, but rather a claim for termination of a contract on the basis of age, there is no reason the rationale for barring employers from maintaining a forced retirement age, *see Johnson v. State of N.Y.*, 49 F.3d 75, 79 (2d Cir. 1995) (holding "termination policy that facially discriminates on the basis of age" violates the ADEA), should not also apply under LAD, which is otherwise analogous to the ADEA, *see Wright*, 227 F. Supp. 2d at 297, but, unlike the ADEA, protects independent contractors.  *Compare J.T.'s Tire Serv.*, 985 A.2d at 214 (finding that § 10.5-12(*l*) has been construed as "prohibit[ing] refusals to do business with independent contractors based on age,"), *with Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 509 (2d Cir. 1994) ("The ADEA does not cover independent contractors."); *see also Rubin v.*

*Chilton*, 819 A.2d 22, 25 (N.J. App. Div. 2003) ("There is no federal statute analogous to [§ 10:5–12(*l*)].").

The facially age-based termination provision, together with Handal's testimony and the age-based policy under which agents aged 64 and over are ineligible to pay a fine to retain their contract, serves as direct evidence that can "support a finding that the [contract termination] was based on an impermissible criterion such as age." *Park*, 2008 WL 619034, at \*9 n.15; *see also Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989) (finding a plaintiff was entitled to a mixed motives jury instruction where the plaintiff's "direct evidence, if believed, clearly showed that age played at least some part in [the defendant's] decisional process" to terminate the plaintiff). The Court therefore applies the "mixed motives" framework, pursuant to which "the burden [now] shifts to the employer to show it would have made the same decision even in the absence of the impermissible consideration." *Sisler*, 157 N.J. at 209 (citing *Price Waterhouse*, 490 U.S. at 248).

### b. Mixed Motives Analysis

Defendants argue that the evidence overwhelmingly demonstrates that Plaintiff's contractual relationship with NWM would have been terminated even absent this consideration. Defendants point to the fact that, by Plaintiff's own admission, Defendants have a longstanding policy of allowing almost all agents to either receive a senior contract or continue their full-time contract by agreement upon reaching the age of 65, and so their decision not to extend these options to Plaintiff could not be based on his age. (*See* Defs.' Mem. 13–18; *see also* Call Tr. 9 ("I'm just asking for what is the normal retirement track, which is at age 65, you go on senior contract."), 13 ("At age 65 it's mandatory senior contract unless you get an exception from the senior partner to continue."), 18 ("I've talked to the home office about what my options are . . .

26

and the plan is to almost everybody, they automatically transition to senior contract except for the ones that stay on full-time contract with the managing partner exception permission granted."), 28 ("Every single agent who went before me went on senior contract without a hiccup."), 33 (listing his options upon reaching 65 as "be assigned to a senior contract, fully retire, [or] remain on the contract if meeting earnings requirements"); *see also* Cenicola Dep. 32–33 (noting that Holleran "gave [her] the senior contract, and I had turned age 66, actually, when I got my senior contract").)  Defendants also note that NWM severed contractual ties with eight other agents based on failure to meet production minimums, and that they were all younger than Plaintiff, varying in age from 25 to 64 years old.  (*See* Holleran Dep. 49–53 (discussing other agents whose contracts were terminated in early February 2016 for failure to meet production minimums in 2015); *see also* Defs.' Decl. Ex. EE ("Agent Chart").)  Defendants also cite deposition testimony and other evidence supporting their argument that the decision to cut ties with Plaintiff was based on considerations other than his age.  (*See* Cenicola Dep. 22 (describing Plaintiff as a "cancer" and that he "did not fit the culture of the agency"); *id.* at 24–26, 46–50 (testifying that Plaintiff intentionally stopped trying to sell NWM products); Call Tr. 7–8, 10, 14, 19, 25 (emphasizing the importance of Plaintiff improving production and otherwise contributing to company culture); Seabolt Dep. 35–38 (describing Plaintiff's longstanding regulatory noncompliance); Defs.' Decl. Ex. H ("Holleran Decl.") ¶ 14 (listing reasons for recommending that NWM sever ties with Plaintiff).)  With respect to Plaintiff's Motion, construing all facts in favor of Defendants, this evidence is sufficient to create at least a dispute of fact regarding whether Defendants would have ended Plaintiff's contractual relationship even without the age-based expiration clause.  *See Tranello v. Frey*, 758 F. Supp. 841, 851 (W.D.N.Y. 1991) ("The defendants' motivation and claimed legitimate reason for the dismissal raise genuine issues of

material fact which may not be resolved on [a summary judgment] motion."), *aff'd in part, dismissed in part*, 962 F.2d 244 (2d Cir. 1992); *Johnston v. Am. Vision Ctr.*, No. 86-CV-2504, 1990 WL 130034, at \*12 (E.D.N.Y. Aug. 27, 1990) (denying the plaintiff's motion for summary judgment on state law age discrimination claim where "[g]enuine issues of material fact remain as to whether [the] defendant's proffered reasons for discharging [the plaintiff] were legitimate"). Plaintiff's Motion for Summary Judgment must therefore be denied.

With respect to Defendants' Motion, and therefore construing all evidence in Plaintiff's favor, although Defendants have produced evidence that there may have been permissible reasons to discontinue their contractual relationship with Plaintiff, there is also evidence from which a jury could infer that Plaintiff would not have been terminated absent consideration of his age. In opposing Defendants' Motion, Plaintiff cites Holleran's testimony in which he says that Handal encouraged him to consider having Plaintiff "pay[] the fine," an established discretionary exception to the production minimums, rather than ending his contractual relationship. (Holleran Dep. 61–62.) Handal testified that during his conversations "about what to do with [Plaintiff's] contract, he was "inform[ed] . . . that [Plaintiff] was not eligible to pay a fine because of his age." (Handal Dep. 45.) Handal then confirmed that he understood "that option was essentially off the table." (*Id.*) Other deposition testimony cited by Plaintiff also confirms that there was a policy at NWM of not offering the fine option to those approaching age 65. (*See* Seabolt Dep. 61 ("My understanding is if [agents] fail minimum the year prior to turning 65 they are not eligible to pay the fine."); Reidl Dep. 78 ("If [Plaintiff] was coming up on 65, he wouldn't be able to pay a fine and extend his contract because he had failed minimum earnings."); Handal Dep. 45 (noting that he was informed Plaintiff "was not eligible to pay a fine because of his age" in the year before he turned 65).)

Construing all facts in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff's ineligibility for the fine exception, which was based on his age, resulted in the termination of Plaintiff's contractual relationship with Defendants, and that he would have been treated differently were it not for consideration of his age.  Put another way, a jury could find that had Plaintiff been younger, and therefore eligible to pay a fine the year that he did not meet his production minimum, NWM may have chosen that option, rather than ending Plaintiff's contract.  *See Grant*, 880 F.2d at 1569 (finding district court erred in failing to give a mixed motives instruction where the plaintiff's "direct evidence, if believed, clearly showed that age played at least some part in [the defendant's] decisional process" to terminate the plaintiff); *Jezek v. Medco Health Sols., Inc.*, No. 10-CV-4410, 2012 WL 209372, at *7 (D.N.J. Jan. 24, 2012) (denying summary judgment for the defendants on retaliation claim under *Price Waterhouse* analysis where the defendant produced evidence that it "made the final decision not to hire [the plaintiff] because he did not have experience handling complex accounts and because [an employment reference] provided negative feedback on [the plaintiff's] job performance," finding that "[t]his is . . . a factual question for a jury"); *see also Scheu v. Charter Commc'ns, Inc.*, No. 08-CV-2835, 2009 WL 10672161, at *12 n.59 (C.D. Cal. Mar. 2, 2009) ("The fact that [the plaintiff] may have been terminated for legitimate as well as retaliatory reasons does not require entry of summary judgment in [the defendant's] favor.").

Furthermore, courts have denied summary judgment where defendants' proffered permissible reasons for ending an employment relationship included relatively minor or isolated performance issues that the employer had previously "overlooked or tolerated" until the prohibited consideration became relevant.  *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 333 (3d Cir. 1995).  Defendants cite Plaintiff's failure to meet his production minimums in

2015, his longstanding compliance issues, and his negative impact on company culture as part of the reason for terminating his contract.  (Defs.' Mem. 13–15.)  Yet Defendants themselves assert that Plaintiff's noncompliance with regulatory standards went on "for years" with no adverse actions taken.  (*Id.* at 14.)  Plaintiff's impact on office culture is in dispute, as the Parties have provided conflicting statements and deposition testimony from Plaintiff's co-workers regarding his behavior in the office.  (*See* Defs.' 56.1 ¶ 69; Cenicola Dep. 21–22; Koral Decl. ¶¶ 17–19; Pl.'s 56.1 Resp. ¶ 65; Greenblatt Decl. ¶¶ 4, 6; Schultz Decl. ¶¶ 5–7.)  Additionally, although Plaintiff did fail to meet his minimum production requirements in 2015, he met his production requirements every year prior to that for 20 years, and was well on his way to meeting his production requirements for 2016 when he was terminated.  (*See* Walfish Decl. ¶ 37; Pl.'s 56.1 ¶¶ 95, 97–98.)  Viewing all circumstances and drawing all inferences in Plaintiff's favor, a jury could reasonably infer that if Plaintiff were younger, and therefore not at the end of his contract and ineligible to pay a fine to remain on contract, Defendants may have handled his first failure to meet production minimums in his 20-year career differently.  *See Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996) (finding dispute of fact in age discrimination claim where the defendants contended the plaintiff was fired for "poor job performance" and his performance review been "falling below standards" in performance and behavior categories, but depositions of employees contradicted that assessment); *Brewer*, 72 F.3d at 330–32 (reversing grant of summary judgment on ADEA claim where the plaintiff had "documented continuous performance problems," but the plaintiff's "own testimony disputed the significance of the problems raised" and the deficiencies "pale beside his consistently good sales performance," because "a reasonable factfinder could view [the defendant's] belated reliance on these criticisms as evidence that tends to show pretext"); *Levin v. Analysis & Tech., Inc.*, 960

F.2d 314, 315–17 (2d Cir. 1992) (finding employer's claim that the plaintiff was terminated because of "dissatisf[action] with his work" and his "attitude problems" did not provide a basis for summary judgment where there was evidence that plaintiff's "irascible nature had for many years been accepted by his co-workers and superiors").

Therefore, Defendant's Motion for Summary Judgment is also denied. *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 49 (2d Cir. 2015) ("This Court has consistently held where subjective issues regarding a litigant's state of mind are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable." (citation and alterations omitted)); *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009) ("Summary judgment is inappropriate when the admissible materials produced in opposition to the summary judgment motion make it arguable that the claim has merit." (citation and quotation marks omitted)); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) ("[The Second Circuit] ha[s] repeatedly noted that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." (citation and quotation marks omitted)); *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 398 (E.D.N.Y. 2016) ("This [c]ourt has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable." (citation omitted)); *Johnston*, 1990 WL 130004, at *12 ("The Second Circuit has warned that summary judgment is generally inappropriate on the issue of intent where discrimination is alleged. . . .  Different factfinders could draw different inferences as to the parties' credibility and could reach different conclusions after trial." (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989))).

c.  Aiding and Abetting

Plaintiff brings his LAD claim against both NWM and Holleran.  Defendants argue that under LAD § 10:5-12(e), an individual "who, by definition, is not an employer under the LAD," (Defs.' Mem. 23), may only be held liable for aiding and abetting a primary violation, *see* N.J. Stat. Ann. § 10:5-12(e) (making it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under this act, or to attempt to do so").  However, Plaintiff's claim arises under § 10:5-12(*l*), which makes it unlawful for "any *person* to . . . contract with . . . or otherwise do business with any person on the basis of . . . age." N.J. Stat. Ann. § 10:5-12(*l*) (emphasis added).  This language directly contrasts with § 10:5-12(a), which by its terms only makes it unlawful "[f]or an *employer*" to discriminate on the basis of a protected characteristic.  N.J. Stat. Ann. § 10:5-12(a) (emphasis added).  Because "there are few cases construing this section of the LAD," *J.T.'s Tire Serv., Inc*, 985 A.2d at 214, it is not clear whether liability under subsection (*l*) is limited to employers.

In any event, Defendants' argument that Holleran cannot be individually liable for aiding and abetting because it was his decision to "cut ties with" Plaintiff and "an individual cannot aid and abet his own conduct" is contrary to caselaw interpreting the LAD.  "[C]ourts construe the aiding and abetting theory [under the LAD] broadly, such that an individual supervisor can aid and abet his own conduct." *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016); *see also DeSantis v. N.J. Transit*, 103 F. Supp. 3d 583, 591 (D.N.J. 2015) ("New Jersey courts have held that an individual can aid and abet, not only the conduct of another person, but that person's own conduct."); *Mann v. Estate of Meyers*, 61 F. Supp. 3d 508, 529–30 (D.N.J. 2014) (concluding that a supervisor was a proper party under the LAD because "an individual

can be held liable under the aiding and abetting provision even where the individual performed the acts of discrimination himself"). Defendants cite *Newsome v. Administrative Office of Courts*, 103 F. Supp. 2d 807 (D.N.J. 2000), for the proposition that an individual cannot aid and abet his own discriminatory conduct under the LAD. *Id.* at 823 ("[T]he alleged principal wrongdoer[] cannot aid and abet his own wrongful conduct."). Although Defendants correctly cite *Newsome*'s holding, subsequent courts interpreting the LAD have clarified that individuals can indeed aid and abet their own conduct, and have attributed cases holding otherwise to "the court's misreading of [*Hurley v. Atlantic City Police Dep't*, 174 F.3d 95 (3d Cir. 1999)] in *Newsome*." *Marino v. Westfield Bd. of Educ.*, No. 16-CV-361, 2016 WL 2901706, at *10 (D.N.J. May 18, 2016). *Hurley* in fact held that, although "a somewhat awkward theory of liability," an individual can be liable "for aiding and abetting the actionable conduct of his employer[] when the challenged conduct is failing to stop the supervisor's own [discriminatory conduct]." *Hurley*, 174 F.3d at 126; *see also Fado v. Kimber Mfg., Inc.*, No. 11-CV-4772, 2016 WL 3912852, at *8 (D.N.J. July 18, 2016) ("[C]ourts in this district have held that a supervisor can be personally liable for his own conduct under the aiding and abetting provision of the LAD." (citation omitted)); *Marino*, 2016 WL 2901706, at *9 ("[T]he Third Circuit has held that a supervisor may be held personally liable for aiding or abetting her own discriminatory conduct." (citing *Hurley*, 174 F.3d at 127)); *Danna v. Truevance Mgmt., Inc.*, No. 05-CV-5395, 2007 WL 2156361, at *3 (D.N.J. July 25, 2007) (rejecting the defendants' argument based on *Newsome*, and finding that "the Third Circuit [has] recognized 'a somewhat awkward theory of liability' under which a supervisor may be found liable for his own" discriminatory conduct under LAD). Therefore, because, as Defendants assert, Holleran was "the principal decision-maker" who "decided to cut ties with [Plaintiff] and recommended that action NWM," he may be

held liable under the LAD.  (Defs.' Mem. 24.)  *See Marino*, 2016 WL 2901706, at *10 (denying

motion to dismiss LAD claims as to individual defendants where the defendants "admit that

[they] were responsible for [the plaintiff's] allegedly unlawful termination").

Defendants also argue that Holleran is entitled to summary judgment even if Plaintiff can

state a viable claim against NWM because aiding and abetting requires "intentional acts of

discrimination by the accused individual."  (Defs.' Mem. 25 (citation and quotation marks

omitted).)  To hold an individual person liable under an aiding and abetting theory,

> a plaintiff must show that (1) the party whom the defendant aids must perform a
> wrongful act that causes an injury; (2) the defendant must be generally aware of his
> role as part of an overall illegal or tortious activity at the time that he provides the
> assistance; and (3) the defendant must knowingly and substantially assist the
> principal violation.

*O'Toole*, 203 F. Supp. 3d at 467 (quoting *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004)).  Defendants

assert that Plaintiff cannot establish liability under this test because "there is no evidence that . . .

Holleran engaged in any acts of intentional discrimination," citing his deposition testimony in

which he explained that his recommendation to terminate was based on performance

considerations.  (Defs.' Mem. 25; *see also* Holleran Dep. 63.)  However, as the Court has already

explained, disputed issues of fact remain with respect to whether Plaintiff's age was a substantial

factor in the decision to end his contractual relationship with NWM, and Defendants concede

that Holleran made the recommendation to "cut ties" with Plaintiff.  (Defs.' Mem. 24.)

Holleran's January 20, 2016 phone call with Plaintiff also reflects his awareness that Plaintiff's

contract would expire upon his reaching age 65; a jury could reasonably infer that, viewing the

evidence as a whole, Holleran's decision to end NWM's contractual relationship with Plaintiff

was made in part based on the fact that Plaintiff's contract was ending, and that he declined to

consider the fine payment option because Plaintiff was ineligible due to his age. Therefore,

Defendants' Motion for Summary Judgment with respect to Holleran is denied.

### III. Conclusion

For the foregoing reasons, the Parties' Motions for Summary Judgment are denied. The

Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 48,

57.) The Court will hold a conference on April 24, 2019 at 3:00 p.m. to discuss the status of the

case.

SO ORDERED.

DATED:     March 28 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

35